UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHIRLEY ANNE ZOELLER,               :
                                    :
     Plaintiff,                     :
                                    :
     v.                             :     CASE NO.  3:18-cv-19(DFM)
                                    :
NANCY A. BERRYHILL,                 :
ACTING COMMISSIONER OF              :
SOCIAL SECURITY,                    :
                                    :
     Defendant.                     :


RULING AND ORDER

The plaintiff, Shirley Anne Zoeller, seeks judicial review

pursuant to 42 U.S.C. § 405(g) of a final decision by the

Commissioner of Social Security ("Commissioner") denying her

applications for social security disability insurance benefits

and supplemental security income.  The plaintiff asks the court

to reverse the Commissioner's decision.  (Doc. # 23.)  The

Commissioner, in turn, seeks an order affirming the decision.

(Doc. # 26.)  For the reasons set forth below, the plaintiff's

motion is granted and the defendant's motion is denied.[1]

_____

     [1]This is not a recommended ruling. The parties consented to
the jurisdiction of a magistrate judge and on May 24, 2017, the
case was transferred to the undersigned.  (Doc. # 29.)

I.  Administrative Proceedings

On July 23, 2014, the plaintiff filed applications alleging that she had been disabled since September 13, 2013.  (R[2] at 397.)  The plaintiff's applications were denied initially on September 27, 2014, and upon reconsideration on January 26, 2015.  (R. at 302, 318.)  She requested a hearing before an Administrative Law Judge ("ALJ") and on June 21, 2016, a hearing was held at which the plaintiff and a vocational expert testified.  (R. at 198.)  On August 16, 2016, the ALJ issued a decision denying the plaintiff's applications.  (R. at 198.)  The ALJ's decision became final on June 19, 2017, when the Appeals Council declined further review.  (R. at 188.)  This action followed.

II. Standard of Review

The court may reverse an ALJ's finding that a plaintiff is not disabled only if the ALJ applied the incorrect legal standards or if the decision is not supported by substantial evidence.  Brault v. Soc. Sec. Admin., 683 F.3d 443, 447 (2d Cir. 2012).  In determining whether the ALJ's findings "are supported by substantial evidence, 'the reviewing court is

---

[2]The administrative record filed by the Commissioner shall be referred to as "R."

2

required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)). "Substantial evidence is more than a mere scintilla. . . . It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447 (quotation marks and citations omitted).

III. Statutory Framework

The Commissioner of Social Security uses the following five-step procedure to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

IV.  Plaintiff's Medical History[3]

The medical evidence submitted to the ALJ begins in February, 2013.  At that time, an MRI of the plaintiff's lumbar spine revealed "interval development of Grade II anterolisthesis[4] due to severe facet arthropathy"[5] at L4-5 with "progressive very severe central canal stenosis[6]. . . .  Mild central and foraminal neural narrowing at L3-4" was also noted.  (R. at 794.)  The plaintiff received physical therapy in July 2013 for her "constant 8-10/10 pain in her back with difficulty sitting, bending and lifting."  (R. at 795.)  On exam, she displayed reduced motor strength in her lower extremities and limited range of motion in her lumbar spine.  (R. at 797.)

---

3 These facts are undisputed.  They are taken from the parties' joint stipulation of facts.  [Doc. # 23].

4 Anterolisthesis is a spine condition in which the upper vertebral body slips forward onto the vertebra below. https://www.spine-health.com/glossary/anterolisthesis.

5 Facet arthropathy is degenerative arthritis which affects the facet joints of the spine. https://www.healthline.com/heath/facet-arthropathy.

6 Central canal stenosis occurs when the central spinal canal is constricted with enlarged ligament and bony overgrowth causing compression of the spinal cord and cauda equina. https://mayfieldclinic.com/pe-dten.htm.  Cauda equina (literally "horse's tail") is a bundle of spinal nerves and spinal nerve rootlets at the base of the spinal column near the first lumbar vertebra.  https://www.healthline.com/human-body-maps/cauda-equina.

Also in July, the plaintiff visited her podiatrist, Dr. Thomas Domanick, for follow up of recurrent and chronic pain overlying her second and third toe deformity. She was diagnosed with symptomatic hammer digit syndrome in her right second and third toes.[7] (R. at 509.) The following month, she had a similar presentation. (R. at 510-11.)

On July 15, 2013, the plaintiff presented to Dr. Francis Alcedo, an internist and plaintiff's primary care provider, with a specialty in internal medicine, with an exacerbation of her spinal stenosis. Dr. Alcedo noted that she had difficulty walking. (R. at 42.) He prescribed a trial of prednisone for the spinal stenosis-related back pain. (R. at 544.)

In the fall, the plaintiff stopped working. She alleges an onset of disability as of September 13, 2013, the last date she engaged in substantial gainful activity.

On September 16, 2013, the plaintiff visited Dr. Richard Blum, an orthopedic surgeon, for evaluation of her spinal stenosis. He noted that she "was doing quite well with a little discomfort." She displayed a normal straight leg raise on

---

7 Hammer toe syndrome is a condition characterized by a series of interrelated digital symptoms and joint changes of the lesser digits and metatarsophalangeal joints of the foot. https://www.ncbi.nlm.nih.gov/medgen/209711.

examination.  Dr. Blum observed that her spinal stenosis at L4-5 was the problem and that any surgery would be extensive, likely involving fusion.  (R. at 1100.)

In September 2013, the plaintiff had additional physical therapy for her spinal stenosis. (R. at  717.)  Her pain pre-treatment was rated 6/10 and post treatment was rated 4/10.  She reported that she felt better after her last session, but had some continued tingling and numbness in the second toe of her left foot.  (R. at 717-18.)

On October 4, 2013, the plaintiff returned to Dr. Blum complaining of numbness in the fourth and fifth toes of her left foot. On exam, her pinprick sensation was intact.  Dr. Blum stated that "[s]he has severe spinal stenosis of the lower lumbar spine."  (R. at 1101.)

Also in October 2013, the plaintiff went to Dr. Vito Errico, a radiologist, for an MRI.  Her record states that she had spinal stenosis-induced back pain that had been bothering her consistently since the first week of July 2013, and occasional foot numbness.  On examinations, her motor function was intact.  Dr. Errico noted that her MRI showed spondylolisthesis[8] which was likely the cause of her back pain.

---

[8]  Spondylolysis is a crack or stress fracture in one of the

Epidural steroid injections were recommended. (R. at 512.)  On
the same day, Dr. Charles Moore, of Yale New Haven Health, noted
that the plaintiff had no neurological deficits and had normal
sensation.  He saw that she could balance on one leg, heel-walk,
toe-walk, and walk tandem.  (R. at 724.)

At the end of October 2013, the plaintiff was discharged
from physical therapy with on-going issues of right foot and
calf numbness as well as right leg weakness.  Clinical
impairments of hypermobility and poor stability were noted.  (R.
at 798-99.)

Also at the end of October, the plaintiff presented to
Connecticut Retina Consultants with loss of vision, blurriness
and cloudiness.  She reported having a harder time recovering
from bright light in both eyes.  There was no edema and trace
waxy disc pallor was noted.  "Left greater than right areolar
granular atrophy" was observed as well as "no recurrence of

---

vertebrae. When the stress fracture weakens the bone to the
extent it is unable to maintain its proper position in the spine
and the vertebra starts to shift or slip out of place, the
condition is called spondylolisthesis.
https://orthoinfo.aaos.org/diseases-conditions/spondylolysis-
and-spondylolisthesis.

iritis." Her retinal pigmentosis[9] appeared clinically stationary. She was continued on Restasis.[10]  (R. at 556-57.)

On November 5, 2013, the plaintiff had an epidural steroid injection for lumbar radiculopathy and back pain.  (R. at 513.)

In November of 2013, the plaintiff experienced a severe increase in pain and weakness in her both legs which made it difficult for her to stand and walk.  The pain had gotten slightly better since restarting physical therapy, but not significantly, and she felt that she had taken huge steps backwards.  (R. at 828.)  On exam, she displayed weakness in multiple lower extremity muscle groups.  (R. at 829.)  She continued physical therapy.  (R. at 832.)

The plaintiff returned to Dr. Blum, her orthopedist, on November 21, 2013 with continued complaints of pain in her lower back.  She had suffered an adverse reaction to a cortisone injection.  She had numbness in the left gluteal area, rectum,

---

[9] Retinitis pigmentosa is a group of rare, genetic disorders that involve a breakdown and loss of cells in the retina, the light-sensitive tissue that lines the back of the eye.  Symptoms include loss of peripheral vision and difficulty seeing at night.  https://nei.nih.gov/health/pigmentosa/pigmentosa_facts.

[10] Restasis is an ophthalmic emulsion that helps to increase the eye's natural ability to produce tears, which may be reduced by inflammation due to chronic dry eye. https://www.restasis.com.

down the left leg, and in the foot.  She was able to walk on her heels and toes.  (R. at 1102.)

In December 2013, the plaintiff reported to her physical therapist that both her feet felt like she was walking on water. She rated the pain in her hips and legs at 6/10.  (R. at 836.)

In physical therapy later that month, the plaintiff said that she felt generally the same.  On exam, she displayed reduced motor strength in several muscle groups including only 3+/5 strength in her left hip with abduction and extension, 4/5 internal and external rotation, and 4/5 strength with knee extension.  (R. at 728).  She was making progress, but both her feet were still numb.  (R. at 729.)  The plaintiff reported that ambulating in grocery stores increased her symptoms.  (R. at 732.)

On January 12, 2014, the plaintiff presented to Advanced Radiology with increased lower back pain and left buttock pain. Her updated MRI showed "marked" narrowing of the L4-5 disc space with first degree spondylolisthesis at that level.  The report noted that "[a]t L4-5 also marked bilateral facet joint arthropathy with associated marked central and bilateral recess stenosis.  Moderate bilateral foraminal stenosis is also seen at

L4-5." The diagnosis was "[m]arked spinal stenosis L4-5." (R. at 570.)

The plaintiff continued physical therapy in February 2014. She displayed 4-5/5 strength in her extremities and was described as doing "fair." (R. at 863.)

By the end of March 2014, she had met her physical therapy goal of ambulating for 30 minutes, but still experienced pain walking around a grocery store. (R. at 740.)

In April 2014, the plaintiff returned to the eye doctor for treatment of her retinal pigmentosis and other eye impairments. Pseudophakia[11] was noted in both eyes. (R. at 764.)

The plaintiff saw Dr. Alcedo, her primary care provider, again on April 18, 2013. She told him that, for the past six months, she had experienced light headedness and vertigo when lying down. (R. at 627-29.)

On May 20, 2014, the plaintiff returned to Dr. Errico, her treating radiologist, for an epidural consult, and explained that she felt no pain relief from her prior steroid injection and that her back pain continued to radiate into her left leg.

---

[11] Pseudophakia means "fake lens." The term refers to the implanting of an intraocular lens to replace a natural lens. https://nei.nih.gov/faqs/cataract/pseudophakia.

She said her right leg had been "giving out."  Dr. Errico observed that her MRIs confirmed the presence of anterior spondylolisthesis of L4-5 and "at that level there is severe spinal canal stenosis as well as nerve root clumping."  His assessment was "[s]ignificant lower back pain with left and right-sided radiculopathy most likely secondary to the severe focal canal stenosis at L4-5."  She was given Tramadol[12] for pain and told to see a surgeon.  (R. at 514.)

In July 2014, the plaintiff slipped and fell, inverting her right ankle and landing on her left knee.  She had significant pain in her right ankle and difficulty ambulating.  There was swelling and tenderness over the malleolus on exam, but no fracture showed on X-ray.  She was prescribed ice as needed for pain, an air cast, and a cane for comfort.  (R. at 524-25.)

On September 18, 2014, Dr. Jeanne Kuslis, a non-examining physician working for the state agency making initial and reconsideration disability determinations for Social Security, opined that the plaintiff could perform light work with postural limitations.  (R. at 262.)

---

[12] Tramadol is an opiate (narcotic) analgesic that is used to relieve moderate to moderately severe pain. https://www.mayoclinic.org/drugs-supplements/tramadol.

On September 29, 2014, the plaintiff visited Dr.

David Brown, an orthopedic surgeon. Dr. Brown's notes

described the plaintiff's

> long history of low back pain dating [back] more than
> eight years. In 2007, she was treated by Dr. Anand [a
> specialist in anesthesiology and pain medicine] for a
> disc herniation with a lumbar epidural cortisone
> injection. She was able to resume work through 2010,
> when symptoms became more severe. She was treated by
> Dr. Errico with another lumbar epidural cortisone
> injection. Symptoms seemed to become more severe
> about one year ago and she tried Celebrex[13] without
> improvement. Ultimately, she consulted an orthopedist,
> Dr. Blum, and [an] MRI examination of the lumbar spine
> was performed demonstrating evidence of spinal
> stenosis at the L4-L5 level. Despite restricted
> activities, she is aware of increasing back pain
> limited [sic] her ability to walk more than 5 to 10
> minutes at a time without developing a sense of
> prominent leg pain associated with some sense of
> numbness to the feet. The patient remains out of work
> through the present date and informs me she will be
> applying for Social Security disability.

(R. at 615.)

Dr. Brown's examination showed the plaintiff was able to

walk without antalgia and had prominent midline low back pain on

forward flexion beyond 60 degrees. Rotation and side bending

were accompanied by midline pain. Her motor strength was

intact. Bilateral straight leg raise tests resulted in back

---

[13] Celebrex is a non-steroidal anti-inflammatory drug
(NSAID), specifically, a cox-2-inhibitor which relieves pain and
swelling. It is used to treat arthritis and acute pain.
https://www.webmd.com/drugs/2/drug-16849/celebrex-oral/details.

pain.  Though her imaging revealed marked spinal stenosis, she did not want surgery or further injections.  Dr. Brown continued the plaintiff's anti-inflammatory medication.  There was no referred pain patter or prominent neurologic deficit; she had intact sensation and her deep tendon reflexes were active.  (R. at 616.)

In October 2014, the plaintiff returned to Connecticut Retina Consultants with complaints of loss of vision, blurriness and foggy vision.  She also had flashes and floaters in both eyes.  Examination showed her right eye had a flattish contour and no evidence of edema.  Her doctor observed that "[t]he [retinal pigmentosis] itself appears clinically stationary, but slow progression is likely and is likely the cause of her visual symptoms." (R. at 609.)  A few weeks later, the plaintiff returned to her retinal specialist with complaints of blurred vision.  On exam, the doctor noted macular puckering[14] with a cloudy right eye.  (R. at 754.)

The plaintiff saw her orthopedist, Dr. Brown, again in October 2014 with complaints of ongoing low back pain.  There

---

[14]A macular pucker is scar tissue that has formed on the eye's macula, located in the center of the light-sensitive tissue called the retina.  A macular pucker can cause blurred and distorted central vision. https://nei.nih.gov/health//pucker.

was no prominent leg pain, numbness, or paresthesias. The plaintiff asked for more conservative treatment and did not want further epidurals. On exam, she displayed good mobility of the lumbar spine and no prominent neurologic deficit. She had Grade I spondylolisthesis, L4-5, with moderate foraminal stenosis. She wanted to avoid surgery and was given Celebrex. (R. at 614.)

On April 14, 2015, the plaintiff treated with her podiatrist for painful, chronic ingrown bilateral hallux nails. She had not responded to conservative care. Her exam showed erythema[15] and reduced pulses. (R. at 977.)

The plaintiff visited her retinal specialist again on May 4, 2015, complaining of vision and blurriness. There were associated symptoms of occasional flashers and floaters in both eyes. Her retinal pigmintosis had not progressed, but the doctor thought it likely was the cause of her visual symptoms, especially at night. Again, her exam was positive for areolar pigmentary changes in the macula. (R. at 9 959-61.)

---

[15] Erythema is a red discoloration of the skin caused by infectious agents, inflammation, drug hypersensitivity, or underlying disease.
https://www.ncbi.nlm.gov./medgen/?term=erythema.

In November 2015, the plaintiff received treatment for hammertoes and other foot abnormalities. (R. at 985.)

The following month, the plaintiff returned to her eye doctor complaining of issues with cloudy vision and sensitivity to light. (R. at 997; 1002.)

In December of 2015, she received treatment for positional vertigo. (R. at 930.)

In a January 12, 2016 questionnaire, the plaintiff stated that she did yoga, washed laundry, and cleaned. (R. at 1111-14). She also stated that she had a history of vertigo when she rolled onto her left side and that Dr. Hewitt performed a maneuver for this issue which usually had a good result. (R. at 1114.)

In February 2016, the plaintiff returned to Dr. Domanick, her podiatrist, complaining of pain in both feet. He noted that she had already undergone steroid injections for Morton's neuroma, and though the injections helped, the pain had returned, on the right greater than the left. Her feet hurt with prolonged walking and she had acquired hallux valgus of both feet. (R. at 988-899.)

On February 29, 2016, the plaintiff returned to her eye doctor with complaints of blurred vision in her right eye which

had gotten worse since her last visit.  Floaters and flashes
were noted in both eyes, and had worsened in the right eye over
the last couple of months.  She was suffering sharp pain in her
right eye occasionally.  Light sensitivity was present in both
eyes and she sometimes felt as if she were "looking through a
fog."  Her exam showed trace waxy disc pallor, no edema and
areolar atrophy.  "Her light sensitivity complaints OD [in her
right eye] I believe are most likely exposure related despite
her Restasis use and punctual plugs."  Again, the doctor noted
that her retinal pigmintosis was stationary but that slow
progression was likely.  (R. at 770-71.)

The plaintiff returned to her podiatrist in April 2016 for
treatment of her Morton's neuroma, acquired hallux valgus, and
hammertoes.  (R. at 992.)

Again in April 2014, the plaintiff saw Dr. Alcedo, her
internist, for chronic issues including numbness of the left arm
and both feet.  In May 2016, her medical issues included
lumbosacral neuritis or radiculitis and spinal stenosis of
lumbar region without neurogenic claudication.  (R. at 1082;
1094.)

On June 23, 2016, Dr. Alcedo rendered his medical opinion
regarding the plaintiff's functional limitations.  He found that

16

her lifting was limited to less than 10 pounds and that she
could stand and walk at least 2 hours in an 8 hour workday and
sit less than 6 hours in an 8 hour day.  With regard to her
postural limitations, she could occasionally climb, balance,
kneel, crouch, crawl and stoop.  Her manipulative abilities
were limited to occasional reaching, handling and fingering.
Dr. Alcedo noted that he first treated her in December of 2014,
most recently treated her on May 23, 2016, and that these
limitations were applicable since December 2015.  (R. at 1095-
1098.)

The ALJ issued her ruling denying benefits on August 16,
2016 and it became final on June 19, 2017.  Following the ALJ's
ruling, the plaintiff again visited Dr. Brown, her orthopedic
specialist, on August 29, 2016.  His report of the visit
included a history of her back condition and functionality, and
his observations, assessments, and medical opinion.
Specifically, he stated that the plaintiff "was positive for and
had a long history of low back and bilateral leg pain with grade
I spondylolisthesis of L4-L5 in 2014.  She had noted progressive
back and leg pain limiting her ability to walk no more than 15-
20 minutes at a time or sit for no more than 20 minutes at a
time before experiencing an increase in back and leg pain.  She

had not been able to work since 2013 due to chronic back pain. She felt her symptoms were becoming more prominent with increased pain leading to shorter periods of walking or standing." On exam, Dr. Brown observed that "[s]he is walking without a prominent antalgic gait. There is limited mobility of the lumbar spine due to complaints of back pain and a sense of stiffness. Bilateral straight leg raising is primarily associated with an increase in back pain. There seems to be good motor strength bilaterally and no prominent neurologic deficit." X-ray showed "prominent" disc space narrowing at the L4-5 level. His assessment was "spondylolisthesis of L4-5" and "chronic low back pain syndrome, probable central canal and foraminal stenosis." Functionally, he concluded that "the patient clearly is not capable of working in any job capacity requiring even short periods of walking, standing, or sitting; and she clearly cannot perform any activity involving bending or lifting even light objects. For all practical purposes, the patient is permanently and totally disabled for gainful employment." ((R. at 78.)

Dr. Brown rendered a more formal opinion on the plaintiff's condition and limitations on October 27, 2016. He said he had treated her since September 29, 2014 and last saw her on August

29, 2016.  He opined that she was limited to less than 10 pounds

of lifting, and that her impairments affected her ability to

stand and walk no more than 15 to 20 minutes at a time, and to

sit for no more than 20 minutes at a time.  She could never

climb, bend, kneel crouch, crawl, or stoop.  She could reach

occasionally.  Dr. Brown attached treatment records in support

of his opinion.  (R. at 75-78.)

In January 2017, the plaintiff had an MRI of her cervical

spine that revealed loss of disc height at C5-6 and C6-7 with

slight flattening of the spinal cord secondary to degenerative

changes.  No significant neuroforaminal stenosis was noted.

There was mild left neural foraminal narrowing at C6-7 and

microvascular ischemic disease shown on her brain MRI.  (R. at

38-39.)  In another MRI performed in June 2017, the plaintiff's

condition at L4-5 was described as "very severe central canal

stenosis."  "Neural foramen again noted to be elongated and

mildly narrowed bilaterally."  (R. at 17.)

Finally, on August 17, 2017, the plaintiff underwent lumbar

fusion surgery with Dr. Brown.  (R. at  11.)

V.    The ALJ's Decision

Following the five-step evaluation process, the ALJ found

that the plaintiff met the insured status requirements of the

Social Security Act through September 30, 2015, and had not engaged in substantial gainful activity since her alleged onset date of September 13, 2013. (R. at 201.) At step two, the ALJ concluded that the plaintiff had severe impairments of degenerative disc disease of the lumbar spine and benign paroxysmal vertigo. (Id.) The ALJ found that the plaintiff's alleged conditions of retinal pigmentosis, hypertension, and a right ankle sprain were not severe impairments. (Id.)

At step three, the ALJ found that the plaintiff did not have an impairment, either alone or in combination, that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. at 203.) In making this determination, the ALJ specifically considered listing 1.04, disorders of the spine, and noted there was no evidence of nerve root compression, motor loss or spinal arachnoiditis or lumbar spine stenosis. (R. at 204.)

The ALJ next determined that the plaintiff had the residual functional capacity (RFC)[16] to perform sedentary work as defined

---

[16] Residual functional capacity (RFC) is an assessment of "the claimant's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. It is the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1).

in 20 C.F.R. § 404.1567(a) and § 416.967(a),[17] except that she can frequently climb ramps and stairs, never climb ladders, ropes and scaffolding; occasionally balance and stoop; frequently kneel, crouch and crawl; and, due to her complaints of poor vision, she is limited to occasional close work. (R. at 204.) The ALJ explained that, in reaching this opinion, she "considered opinion evidence in accordance with the requirements of 20 CFR §§ 404.1527 and 416.927 and SSR 96.2p, 96-5, 96-6p, and 06-3p." (R. at 204.) As to the plaintiff's credibility, the ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of these symptoms were not consistent with the medical and other evidence in the record. (R. at 205.)

At step four, the ALJ concluded that the plaintiff was capable of performing her past relevant work as a telephone operator. (R. at 206-07.) The ALJ was persuaded by the

---

[17] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

testimony of the vocational expert who testified that the plaintiff's work as a telephone operator (Dictionary of Occupational Titles 235.662-022), is semi-skilled (SRP 3) work performed at the sedentary exertional level and that the plaintiff's additional restriction of occasional reading or close work did not preclude that job.  (Id.)

The ALJ concluded that the plaintiff had not been under a disability, as defined in the Social Security Act, from September 13, through the date of the decision, 20 C.F.R. § 404.1520(f) and § 416.920(f), and was not disabled under section 1614(a)(3)(A) of the Social Security Act.  (Id.)

After the ALJ's decision, the plaintiff submitted new medical evidence to the Appeals Council, including numerous medical records that were not previously available to the ALJ, as well as medical source opinions from her treating orthopedic surgeon.  The Appeals Council included the evidence in the administrative record, but declined to consider it.  (R. at 188-89.)

V.   Discussion

    Additional Evidence Not Considered By Appeals Council

The plaintiff argues that the defendant improperly refused to consider the additional evidence she submitted to the Appeals

Council, specifically, the opinions and supporting clinical notes of the plaintiff's treating orthopedic surgeon.  The defendant argues that the plaintiff did not meet the requirements for submitting the additional evidence.

The Appeals Council is required to consider additional evidence if it is new, material, relates to the period on or before the date of the hearing decision, and there is a reasonable probability that it would change the outcome of the ALJ's decision.  20 C.F.R. § 404.970(a)(5).  In addition, there must be a showing of good cause, *i.e.*, either (a) the SSA misled the claimant, (b) some impairment prevented timely submission of the evidence, or (3) some other circumstance beyond claimant's control prevented timely submission. 20 C.F.R. 404.970(b); <u>see also</u> <u>Ebert v. Berryhill</u>, No. 16-cv-1386(WIG), 2018 WL 3031852, at * 8 (D. Conn. June 19, 2018).  Good cause exists when the plaintiff shows some "unusual, unexpected, or unavoidable circumstance beyond her control that prevented her from submitting the evidence earlier."  <u>Orriols v. Colvin</u>, No. 14-cv-863 (SRU), 2015 WL 5613153, at *3 (D. Conn. Sept. 4, 2015).

The good cause requirement is not at issue here.  The Appeals Council advised the plaintiff by letter that it found good cause existed for the additional evidence she submitted.

Because your case was pending at the Appeals Council before our rule about when to give us evidence became effective, we will find that you showed good cause for not submitting additional evidence earlier. We will find that some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from telling us about or giving us the evidence earlier. We will make this good cause finding for additional evidence that you have already submitted and for additional evidence that you submit before we issue our action in your case.

(R. at 30-31.)

The remaining question is whether the plaintiff met the other requirements for submitting additional evidence to the Appeals Council. *i.e.*, that it was new, material, relates to the period at issue, and shows a reasonable probability of changing the outcome of the hearing decision. New evidence is any evidence that has not been considered previously during the administrative process. <u>Pollard v. Halter</u>, 377 F.3d at 193. Evidence that "is cumulative to that already contained in the record prior to the ALJ's decision is, by definition, not new and need not be considered." <u>McIntyre v. Astrue</u>, 809 F. Supp.2d at 20.

The plaintiff has shown that the additional evidence was "new." It was previously unavailable, and was not cumulative to the evidence before the ALJ. At the time the ALJ issued her decision, the record did not contain any opinion from the

plaintiff's treating orthopedic surgeon.

The plaintiff's new evidence relates to the period on or before the date of the ALJ's decision.  Even a cursory review shows the evidence relates to the same back and leg issues that existed before the date of the ALJ's decision.  Nothing in the reports suggest they concern new conditions. [18]  See Lofton v. Berryhill, NO. 17-cv-6709 (JWF), 2019 WL 1244055, at *3 (W.D.N.Y. March 18, 2019) (finding error where appeals council summarily rejected medical source opinion without analyzing whether it pertained to the plaintiff's existing condition where it contained nothing to suggest it concerned a new condition).

Finally, the plaintiff's additional evidence is material because it is both "relevant to the claimant's condition during the time period for which benefits were denied and probative." Del Carmen Fernandez v. Berryhill, 2019 WL 667743, at *11.

---

[18] The plaintiff does not claim that the Appeals Council erred in declining to consider the additional evidence that was duplicative of evidence in the record.  She also does not claim error in the Appeals Council's refusal to consider evidence relating to the plaintiff's condition after the date of the ALJ's August 16, 2016 decision.  Indeed, such evidence would not be admissible because it would have had no bearing on whether the plaintiff was disabled at the time of the ALJ's decision.  That evidence would only be relevant if the plaintiff filed a new application alleging a disability since the date of the decision. Quintana v. Berryhill, No. 18-cv-561 (KHP), 2019 WL 1254663, at *15 (S.D.N.Y March 19, 2019).

Evidence is probative if there is a "reasonable possibility that [it] would have influenced the [ALJ] to decide the claimant's application differently." Patterson v. Colvin, 24 F. Supp.3d 356, 372 (S.D.N.Y. 2014)).

Here, the additional evidence is material and probative because it consists of the medical opinion and treatment notes of the plaintiff's orthopedic surgeon relating to her condition during the time at issue. See Pollard v. Halter, 377 F.3d at 193. Indeed, the medical opinion of the plaintiff's orthopedic surgeon is highly probative and is entitled to great, if not controlling, weight pursuant to the treating physician rule.[19] Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (noting that opinion evidence from a treating physician must be given controlling weight if it is supported by medically acceptable clinical and diagnostic and laboratory evidence and is not inconsistent with other evidence); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); see also 20 C.F.R. § 404.1527 (c)(5)

---

[19] The Social Security Act and the regulations regarding the treating physician rule were amended effective March 27, 2017. The court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect. Maloney v. Berryhill, No 16-cv-3899 (ADS), 2018 WL 400722, at *1 (E.D.N.Y. Jan. 12, 2018) (citing Lowry v. Astrue, 474 Fed. App'x 801, 805 n.2 (2d Cir. 2012)).

(stating more weight is given to the opinion of a medical
specialist about medical issues in his area of specialty than
the weight given to the opinion of a non-specialist).  The
Appeals Council's rejection of the evidence without any
substantive analysis pursuant to the treating physician rule was
error.  Lebow v. Astrue, 2015 WL 1408865, at *7-7 (S.D.N.Y.
March 9, 2015)(holding that the Appeals Council's "failure to
evaluate the additional evidence in the manner required by the
treating physician rule was legal error."); McIntyre v. Astrue,
809 F. Supp.2d 13, 22 (D. Conn. 2010) (noting that the Appeals
Council's failure to evaluate new evidence according to the
applicable regulations and give reasons for its decision not to
credit it is legal error).

Because this new evidence was never considered by the ALJ,
the "proper course for the reviewing court is to remand the case
for reconsideration in light of the new evidence." Shrack v.
Astrue, 608 F. Supp.2d 297, 302 (D. Conn. 2009); Garcia v.
Comm'r Soc. Sec., 208 F. Supp.3d 547, 552 (S.D.N.Y. 2016);
Collazo v. Colvin, 13-cv-5758 (RJS) (HBP), 2015 WL 9690324, at
*13 (S.D.N.Y. Dec. 22, 2015) (noting that the Appeals Council is
bound by the treating physician rule and its boilerplate reason
for not considering such evidence did not satisfy the

requirement that the Commissioner give good reasons for rejecting such opinion evidence). The new evidence submitted to the Appeals Council is now part of the record and must be considered on remand. E.g., Warton v. Berryhill, No. 17-cv-1247 (LTS/BCM), 2018 WL 5619961, at *18 (S.D.N.Y. Aug. 14, 2018).

Other Claimed Errors

The plaintiff also argues that (1) the ALJ erred in failing to perform a function by function assessment of the plaintiff's relevant and contested functions of standing, walking, and sitting; and (2) the ALJ erred in failing to reconcile and obtain an explanation for a conflict between the vocational expert's testimony and the Dictionary of Occupational Titles (DOT) concerning the visual acuity requirements of the plaintiff's past relevant work.[20]  In light of the foregoing, the court need not address the plaintiff's other arguments because "upon remand and after a de novo hearing [the ALJ] shall review

---

[20] With respect to the plaintiff's claim that the ALJ erred in failing to identify and explain an apparent conflict between the vocational expert's testimony and the DOT requirement pertaining to the visual acuity required for the telephone operator job, the court notes that the Second Circuit recently ruled that a vocational expert's testimony cannot constitute substantial evidence if it contains an apparent or obvious conflict with the DOT. In that event, the ALJ has an affirmative obligation to identify and elicit a reasonable explanation for the conflict before she can rely on the vocational expert's testimony. Lockwood v. Comm'r Soc. Sec., 914 F.3d 87, 91-92 (2019).

this matter in its entirety." <u>Delgado v. Berryhill</u>, No. 17-cv-54(JCH), 2018 WL 316198, at *15 (quoting <u>Koutrakos v. Astrue</u>, No. 3:11CV306(CSH)(JGM), 2012 WL 1283427, at *7 (D. Conn. Jan. 9, 2012), report and recommendation adopted, 906 F. Supp.2d 30 (D. Conn. 2012)).

V. <u>Conclusion</u>

For these reasons, the plaintiff's motion to reverse and/or remand the Commissioner's decision (doc. #23) is granted and the defendant's motion to affirm the decision of the Commissioner (doc. #26) is denied.

SO ORDERED at Hartford, Connecticut this 17th day of June, 2019.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge